IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

PIERRE D. DANIELS,

     Plaintiff,

v.                                          CASE NO. 1:17-cv-4-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("DIB") and supplemental

security income ("SSI") pursuant to Title II and Title XVI, respectively, of

the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has

answered, (ECF No. 10), and both parties have filed briefs outlining their

respective positions. (ECF Nos. 21–22.) For the reasons discussed below,

it is recommended that the Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff previously filed applications for Title II DIB and Title XVI

benefits, alleging a disability onset date of July 9, 2009. (R. 99–117.) His applications were denied initially, upon reconsideration, and following an administrative hearing in an Administrative Law Judge's ("ALJ") written decision on March 17, 2011. (*Id.*) The Appeals Council ("AC") thereafter denied Plaintiff's request for review, noting that medical records Plaintiff provided in support of review—which covered a period after the ALJ's March 17, 2011 decision—did not affect the decision about whether Plaintiff was disabled beginning on or before March 17, 2011. (R. 118–24.) The AC advised Plaintiff, however, that if he wanted the Commissioner to consider whether Plaintiff was disabled after March 17, 2011, he needed to reapply. (*Id.*) The AC informed Plaintiff that if he reapplied the Commissioner would use May 20, 2011, the date of his request for review, as the date of his new claims. (*Id.*)

Accordingly, Plaintiff protectively filed his application for Title II DIB and Title XVI benefits on May 20, 2011, alleging disability beginning August 31, 2011. (R. 35, 119, 247–54.) Plaintiff claims he cannot work due to chronic kidney disease, gout attacks, uncontrolled diabetes, increased blood pressure, side effects from medications, headaches, and joint pain. (R. 276, 285, 297, 305.) Plaintiff's applications were denied initially and

upon reconsideration. Plaintiff then attended an administrative hearing before ALJ Arline Colon on April 22, 2015. (R. 57–98.)  The ALJ issued a written decision on July 13, 2015, finding Plaintiff not disabled.  (R. 35–50.) The AC denied Plaintiff's request for review. (R. 1–4.) Plaintiff subsequently appealed the ALJ's decision to this Court. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human

Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905

(2015).[1] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511, 416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

### III.  SUMMARY OF THE RECORD

**A.    Medical Records**

Plaintiff has a history of type 2 diabetes mellitus, hypertension, diabetic neuropathy, shoulder pain, and gout. He presented to University of

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Florida Family Medicine ("UF Family Medicine") on May 11, 2011, for a follow-up visit regarding these issues. (R. 611–15.) He reported being adherent with medications and that his hypertension seemed to improve with adherence to regimen. He complained, however, of continued shoulder pain and use of oxycodone for pain control. Physical examination was normal except for a tender right great toe. Matthew Odom, M.D., noted that Plaintiff's hypertension had improved, Plaintiff's diabetic neuropathy was stable, and recommended that Plaintiff be re-evaluated for shoulder surgery.

In September 2011, Plaintiff presented to the emergency department at Shands with complaints of chest pain. (R. 357–61.) On physical examination Plaintiff's chest was clear to percussion and auscultation bilaterally without wheezing, ronchi, or rhales. He had a regular cardiac rhythm and rate. His extremities had good distal pulses without edema. X-rays of Plaintiff's chest and abdomen, were negative. (R. 377–79.) Both kidneys demonstrated normal echotexture with no evidence of cortical thinning, stones, or hydronephrosis. (R. 379.) Plaintiff had no chest pain during a treadmill stress test. (R. 366–68.) The exact cause of Plaintiff's symptoms could not be determined, but Dr. Odom opined that it may be

gastroparesis. (R. 341.) Plaintiff returned to see Dr. Odom three days later, reporting that his chest pain was doing well, despite an episode of substernal chest pain. (R. 453–58.)

Plaintiff was assessed with acromioclavicular degenerative joint disease bilaterally, with possible bilateral impingement in November 2011. (R. 534–37.) Plaintiff was given an injection over the right acromioclavicular ("AC") joint where he was most symptomatic.

In November 2011, Plaintiff reported that the AC joint injection decreased his shoulder pain from ten to eight. (R. 447–49.) He denied headaches, dizziness, chest pain, shortness of breath, and bowel or bladder problems. (R. 447–49, 466–67.) Physical examination was largely normal. Because Plaintiff reported some elevated blood sugar levels in the evening, Dr. Odom advised Plaintiff to keep close tabs on his blood sugar levels and noted that Plaintiff's hypertension was stable. (R. 447–49.)

In December 2011 Plaintiff reported controlled blood pressure and continued denial of headaches, dizziness, chest pain, and shortness of breath. (R. 444–46.) With the exception of a small area of dermatitis on his left hand, physical examination was normal. Dr. Odom noted that Plaintiff's diabetes was stable and his hypertension well controlled with the current

medication regimen.

Shoulder x-rays on December 19, 2011, revealed degenerative changes of the AC and glenohumeral joints in both shoulders, mild impingement changes involving the humeral head but without acute bony abnormality in the left shoulder, and moderate impingement changes involving the humeral head but without acute bony abnormality in the right shoulder. (R. 539–40.) Plaintiff was assessed with rotator cuff tear and biceps tendinopathy. (R. 529–32.)

Plaintiff eventually underwent right shoulder surgery on January 4, 2012. (R. 525–27.)

On February 8, 2012, Plaintiff was doing well and recovering from shoulder surgery. (R. 441.) His fasting blood sugar was elevated but Plaintiff admitted to dietary indiscretions since surgery. Plaintiff continued to deny headaches, dizziness, chest pain, shortness of breath. Physical examination was normal. Dr. Odom advised Plaintiff to work on improving control of his diabetes and discussed with Plaintiff the importance of dietary adherence.

By March 2012, Plaintiff's shoulder pain was improving and it was non-tender to palpation. (R. 519.) Plaintiff, however, reported intermittent

headaches, which Plaintiff thought were related to his medication (R. 438–40.) He told Dr. Odom that his blood sugars were running a bit higher but have improved and that his hypertension was doing better. Plaintiff denied dizziness, chest pain, and shortness of breath. Physical examination was normal. Dr. Odom noted that Plaintiff's diabetes was uncontrolled but his hypertension "much improved control." Dr. Odom instructed Plaintiff to closely monitor the association between his blood pressure medications and his headaches

At the end of March 2012, Plaintiff had an acute flare of gout in his right foot/ankle. (R. 435–47.) Dr. Odom prescribed Plaintiff a steroid pack.

In April 2011, Plaintiff reported burning foot pain without numbness or tingling in either his hands or feet, which was mildly relieved with neurontin (R. 429–30.) Plaintiff reported no shortness of breath, chest pain, palpitations, abdominal pain, joint pain, or muscle pain. Examination revealed no edema in his extremities and his musculoskeletal examination was negative. Ryan Noonan, M.D., noted that Plaintiff's symptoms were consistent with diabetic neuropathy and that Plaintiff likely needed an increased dosing frequency. Dr. Noonan also counseled Plaintiff to exercise.

By May 2012, Plaintiff's shoulder was doing well, despite some weakness. (R. 517–18.) Examination revealed a full range of motion and 5/5 strength upon internal and external rotation.

Plaintiff presented for a follow-up with Dr. Noonan on May 6, 2012. (R. 426–27.) He admitted not being compliant with lantus on a daily basis and that he often misses his morning dose due to how busy he is at that time of day. Plaintiff denied shortness of breath, chest pain, palpitations, abdominal pain, joint pain, muscle pain, neurological issues, and urinary issues. His blood pressure was 140/80 and his physical examination normal. Dr. Noonan instructed Plaintiff to begin taking lantus in the evening to improve compliance and counseled Plaintiff on the importance of compliance with his medications.

Plaintiff returned for a follow-up with Dr. Odom on May 9, 2012, at which time he reported improving control over his diabetes. He still taking the Lantus in the morning (R. 423–25.) His hypertension was well-controlled and his right foot pain was improving. Plaintiff denied headaches, dizziness, chest pain, shortness of breath, bowel or bladder issues. Other than a small rash on his left hand, physical examination was normal. Dr. Odom noted that Plaintiff's diabetes was stable and his left foot

pain improved.

On June 22, 2012, Plaintiff presented to UF Family Medicine with left knee pain, which he reported having on and off for eight years. (R. 416–18.) Plaintiff informed Garth Adkins, M.D. that his last knee x-ray in 2007 revealed mild tricompartmental degenerative changes, fragmentation of the lateral inferior patella, no joint effusion, and remaining visualized osseous structures intact. Plaintiff also reported having elevated blood sugar for the past week or so but denied headaches, fatigue, shortness of breath, chest pain, and abdominal pain. His blood pressure was 108/70 and his physical examination normal. Dr. Adkins noted Plaintiff had poor control over his diabetes, but that his hypertension was controlled. Dr. Adkins advised Plaintiff to begin taking aspirin for coronary artery disease, opined that Plaintiff's knee pain was likely osteoarthritis, and advised Plaintiff to take tylenol and exercise.

Plaintiff presented to the Orthopaedic and Sports Medicine Institute ("OSMI") on July 23, 2012, for a left shoulder and left knee evaluation. (R. 515–16.) Plaintiff reported that his right shoulder pain had improved since surgery but that his left shoulder continues to cause pain at night and with overhead activities. He also reported that his left knee had become more

symptomatic. Plaintiff was referred to non-operative orthopaedics for management of his left knee pain. Plaintiff advised that he would follow-up for further discussion regarding sugery on his left shoulder after his knee pain resolved.

Plaintiff returned to UF Family Medicine on August 10, 2012, with complaints of joint pain and foot swelling. (R. 414–15.) On examination Plaintiff's left knee was swollen and tender to the touch and his left great toe was also tender to touch. Plaintiff nonetheless demonstrated a normal range of motion and physical examination was otherwise normal. Jose Armas, M.D. assessed Plaintiff with gout and knee pain, prescribed colchicine for the gout flare, and referred Plaintiff for uric acid testing and for an appointment with orthopedic surgery

Plaintiff returned to UF Family Medicine four days later to review the uric acid test results. (R. 555–56.) Plaintiff told Michael Machek, M.D., that the colchicine was effective, but that he still has some pain in the left knee, although it had largely improved, as well as some pain in his feet likely due to peripheral neuropathy. Plaintiff's blood pressure was 164/100 and his pulse 80. Physical examination was normal. Dr. Machek instructed Plaintiff on the importance of a balanced diet and exercise, advised Plaintiff to

increase his evening does of Lantus, and told Plaintiff to continue neurontin for peripheral neuropathy. As to the gout, Dr. Machek instructed Plaintiff to avoid aspirin and certain foods.

Plaintiff returned to the OSMI on September 4, 2012, for a knee pain evaluation. (R. 510–14.) His reported pain was a 3 out of 10 at rest and a 6 out of 10 with walking. Physical examination was normal other than jaundice in the eyes and tenderness in his left knee. Plaintiff demonstrated normal range of motion and normal strength in his left knee. Jason Zaremski, M.D., assessed Plaintiff with chondromalacia of patella, patellar tendinitis, and patellofemoral pain syndrome and prescribed a patellofemoral brace and physical therapy.

At a follow-up with Dr. Machek on September 6, 2012, Plaintiff reported increasing the Lantus as instructed but that his morning blood sugars ranged from 120–200. (R. 552–54.) Plaintiff also reported being compliant with his hypertension medications and eating a balanced diet. His blood pressure, however, measured at 150/90. Dr. Machek assessed Plaintiff's diabetes as uncontrolled and encouraged Plaintiff to log his blood sugar readings and to stop smoking. For Plaintiff's gout, Dr. Machek prescribed colchicine, allopurinol and told Plaintiff to avoid foods high in

purines. Dr. Machek also noted that Plaintiff's chronic kidney disease did not appear to be getting any worse and encouraged Plaintiff to maintain a renal diet and to increase fluid intake.

On September 14, 2012, Plaintiff presented to the emergency department at Shands Hospital with a severe headache. (R. 404–07.) He had no chest pain, shortness of breath, vomiting, abdominal pain, weakness, lightheadedness, or numbness. Plaintiff's blood pressure was 160/90 and his pulse 66. Cardiovascular, chest, abdominal, and neurological examinations were normal. Plaintiff demonstrated a normal range of motion in his extremities without edema or tenderness. Two days later, Plaintiff was assessed with migraine, cluster headache, and neuralgia. (R. 487–92.)

Plaintiff returned to UF Family Medicine with complaints of left knee pain on September 24, 2012. (R. 549–51.) Examination was largely normal other than a positive patella grind and pain and heat from the joint. Plaintiff was given a steroid injection in his left knee, which significantly improved the range of motion and pain in Plaintiff's knee prior to leaving the office.

Plaintiff returned to see Dr. Machek on October 12, 2012, reporting flank and lower back pain and left knee pain. (R. 547–48.) Plaintiff told Dr.

Machek that he had not been wearing the knee brace he was prescribed because it increased swelling and pain. Plaintiff also stated that he had been unable to participate in physical therapy because he was previously unable to move his knee at all and was in too much pain. Plaintiff stated, however, that he was now willing to try physical therapy. Examination was largely normal other than pain with knee palpation. Dr. Machek referred Plaintiff to orthopedics for viscosupplementation and to physical therapy.

Accordingly, Plaintiff returned to see Dr. Zaremski on October 24, 2012, and told Dr. Zaremski that he had received the steroid injection in his left knee, which provided some relief. (R. 504–09.) Plaintiff complained, however, of right knee pain with instability, occasional locking, and inability to walk long distances. Plaintiff admitted not being complaint with his treatment plan and that he had not yet attended physical therapy. Physical examination was normal and there was no swelling or effusion in either knee. Range of motion in both knees was normal and Plaintiff reached flexion to 130 degrees in both knees. There was, however, tenderness in his right knee. An x-ray of Plaintiff's right knee revealed mild tricompartmental osteoarthritis without fracture, dislocation, or joint effusion. (R. 538.) Dr. Zaremski assessed Plaintiff with patellofemoral pain

syndrome, chondromalacia of patella, and osteoarthritis of the knee, and prescribed Plaintiff a hinged knee brace. (R. 508.) Dr. Zaremski emphasized that Plaintiff must go to physical therapy for both knees. (R. 508–09.)

In November 2012 Plaintiff reported that his pain had largely improved from his previous visit to UF Family Medicine. (R. 545–46.) Plaintiff also told Dr. Machek that he now wears his knee braces and that he does feel some improvement with the braces. Plaintiff's blood pressure was 136/80 and his physical examination normal. Dr. Machek assessed Plaintiff's gout as stable and Plaintiff's diabetes to be under control.

Plaintiff presented to the emergency department at Shands on November 30, 2012, for a gout flare in his left foot/ankle, which rendered him unable to walk. (R. 630–34.) Other than tenderness on palpation with decreased range of motion in his left ankle/foot, physical examination was normal. An x-ray revealed no acute radiographic abnormality of the left ankle. (R. 641.) Plaintiff was given narcotics for pain, colchicine to treat the gout inflammation, and discharged later that day.

Plaintiff returned to UF Family Medicine on December 7, 2012, for evaluation and management of gout (R. 750–51.) He also reported chest

pain, shortness of breath on exertion, dysuria, and joint pain, but no headaches, vision changes, or edema. Physical examination was normal. There was no edema present, Plaintiff's strength and sensation were intact, his chest was clear, he had a grossly normal neurological exam, and Plaintiff had a regular heart rate and rhythm. Dr. Machek increased the allopurinol prescription for gout and gabapentin prescription for diabetic neuropathy.

Plaintiff returned to UF Family Medicine one week later with complaints of severe pain in the left knee and ankle. (R. 748–49.) He reported an inability to bear weight or lift his leg and that he was getting no relief from medications. Physical examination was normal, other than a warm, swollen left knee, ankle, and great toe. Dr. Machek assessed Plaintiff with a gout flare and referred him to rheumatology to discuss management options.

At his next follow-up with Dr. Machek on January 14, 2013, Plaintiff complained of increased shoulder pain from helping a falling woman. (R. 745-46) He denied fainting, dizziness, visual changes, headaches, chest pains or irregular heart beats and reported tolerating his blood pressure medications well. Physical examination was normal.

Plaintiff returned to the OSMI on January 23, 2013, for a left knee evaluation. (R. 676–81.) Plaintiff told Dr. Zaremski that his pain had "moderately improved since restarting oral prednisone for his gout, but sa[id] that off prednisone his pain is still preventing him from working." (R. 676.) Plaintiff had tried using his knee brace for three weeks but stopped because he did not think it was working. Physical examination was normal. There was no swelling, effusion, or tenderness to his left knee. He had a normal range of motion and normal strength in his left knee. All tests were negative. Dr. Zaremski also examined Plaintiff's right knee and discovered no swelling, effusion, or tenderness, normal range of motion, and normal knee strength. Plaintiff also demonstrated a normal gait. Dr. Zaremski assessed Plaintiff with osteoarthritis of the knee and recommended viscosupplementation to the left knee.

In February 2013 Plaintiff returned to UF Family Medicine with complaints of chest pain, vision changes, shortness of breath, and diabetes complications including neuropathy. (R. 742–44.) He denied syncope, dizziness, headaches, and irregular heart beats. Plaintiff told Dr. Machek that prednisone helped his foot pain, although he felt like the pain was returning. Physical examination was normal. Dr. Machek discussed

with Plaintiff the need to adhere to his medications, limit caffeine intake, increase regular exercise to thirty minutes per day for four to six times per week, monitor his sugars, and to stop smoking.

In March 2013, although Plaintiff complained of right foot and toe pain, vascular examination was normal, and neurological evaluation was normal without evidence of diabetic neuropathy. (R. 738.) Although his hypertension appeared uncontrolled, Plaintiff admitted he had not taken his blood pressure medications. (R. 733–35.)

By April 10, 2013, Plaintiff reported taking his medications as prescribed and that he had no side effects. He also had no active symptoms related to diabetes complications and his blood pressures were usually within normal limits. Physical examination was normal. Nevertheless, Dr. Machek assessed Plaintiff's diabetes as uncontrolled, which he associated with Plaintiff being on prednisone twice in the last few months and Plaintiff's non-compliance with exercising and diet control (R. 730–31.)

In May 2013, Plaintiff continued to report no significant medication side effects. (R. 725–29.) Dr. Machek noted, however, that Plaintiff was poorly compliant with his medications, and emphasized that he needs to

quit smoking, exercise, and adhere to a low carbohydrate diet.

Plaintiff returned to see Dr. Machek on July 5, 2013, reporting no changes in vision, chest pain, palpitations, or shortness of breath. Plaintiff claimed to being "fairly" compliant with hypertension medications, and told Dr. Machek that he had no low sugars and no recent gout flairs. Plaintiff's physical examination was normal but his blood pressure measured at 160/80. Dr. Machek assessed Plaintiff's diabetes as uncontrolled and his hypertension to be "resistant," but noted that Plaintiff was likely not compliant with his medications. (R. 927–28.)

Later that month, Plaintiff admitted to Dr. Machek that he was not checking his blood pressure. (R. 925–26.) Dr. Machek noted that Plaintiff's hypertension was controlled when he takes medications and thus instructed Plaintiff to continue taking his medications regularly, continue dieting, and to exercise daily. Dr. Machek further noted that Plaintiff's diabetes had improved since his prior visit.

Nevertheless, on October 3, 2013, Plaintiff returned to UF Family Medicine, reporting that he had been without insulin for ten days because his Medicaid lapsed and he could not obtain a refill. Since resuming insulin, however, Plaintiff's blood sugars decreased from the 220s to the 140s.

Plaintiff told Dr. Machek that his blood pressure was usually around 145/85 and that he was taking his medications and tolerating them well. He did have one recent syncopal event, however, which caused him to fall. Dr. Machek assessed Plaintiff's diabetes as under "borderline control," and again encouraged Plaintiff to diet and exercise (R. 920–21.)

In November 2013, Plaintiff reported taking his medications as prescribed, with no side effects, but claimed to still experience peripheral neuropathy. (R. 916–17) Musculoskeletal and neurological examinations were, however, within normal limits. Dr. Machek increased Plaintiff gabapentin dosage.

On November 25, 2013, Plaintiff presented for an endocrinology diabetes consultation with Colleen Digman, M.D. (R. 963–69.) Plaintiff's blood pressure was 142/87 and other than spots of dry skin, physical examination was normal. Dr. Digman adjusted Plaintiff's diabetes medication regimen and advised Plaintiff that he may need to eventually use insulin therapy only. Dr. Digman instructed Plaintiff to check his sugars twice a day and bring the results to his next visit. She also advised Plaintiff to work on smoking cessation.

When Plaintiff returned to see Dr. Digman in January 2014, he forgot

to bring his sugar meter and log book. (R. 970–76.) Plaintiff reported that he still smoked and was not ready to quit. He also admitted that although he had one high blood sugar reading it was after eating rice. Other than decreased microfilament testing bilaterally, physical examination was within normal limits. There were no cuts or sores on Plaintiff's feet. Dr. Digman adjusted Plaintiff's medications accordingly.

In February 2014, Plaintiff told Dr. Machek he was taking his medications as prescribed but admitted he was not checking his blood pressure at home and not exercising. (R. 999–1000.) He reported blood sugars in the mornings around 180–200 and that he did not have any low sugars. Physical examination was normal and his blood pressure was 140/90. Dr. Machek told Plaintiff to keep a low salt, radical diet, increase physical activity and exercise, limit caffeine, and that he needs to quit smoking.

At his next follow-up with Dr. Digman in March 2014, he forgot to bring his sugar meter and his log book was missing several weeks of logs. (R. 978–84.) Plaintiff reported he had not adjusted his medications as previously instructed. Other than decreased microfilament testing

bilaterally, physical examination was within normal limits. There were no cuts or sores on Plaintiff's feet. Dr. Digman again adjusted his medication, nothing that Plaintiff's diabetes had been effected by intermittent steroid use and noncompliance with medication dosages.

In March 2014, Plaintiff presented to emergency room at Shands for gout flare. (R. 1140–53.) He was discharged later the same day. Upon presenting for a discharge follow-up with Dr. Machek, Plaintiff told Dr. Machek that his gout flares, although occurring almost weekly, were relieved with prednisone. (R. 997–98.) He reported taking his blood pressure medications as prescribed but claimed the pharmacy was not giving him all of his medications. Plaintiff also admitted that he does not check his blood pressure at home. He denied chest pain, shortness of breath, headaches, and dizziness. On examination his blood pressure was 160/100 and physical examination was normal. Dr. Machek advised Plaintiff to present during his next gout flare so the joint could be aspirated, as there was concern that the alleged flares may not always be gout attacks. Dr. Machek noted that Plaintiff's diabetic neuropathy was uncontrolled and that, although improved, Plaintiff's diabetes also remained uncontrolled. Dr. Machek also described Plaintiff's hypertension

as uncontrolled, but stated that "[t]here has always been question of noncompliance as he has multiple issues and reasons/excuses for the way things are and little to no improvement even with multiple agents." (R. 998.)

In April 2014 Plaintiff reported sugars in the morning in the 140s and no low sugars. His blood pressure was 120/80 and physical examination was normal. Plaintiff had no joint pain. Dr. Machek noted that Plaintiff's diabetic neuropathy and hypertension was controlled. Although Plaintiff's gout was noted to be uncontrolled, Dr. Machek increased Plaintiff's medication. (R. 989–90.)

On May 12, 2014, Plaintiff presented to the emergency room at North Florida Regional Medical Center ("North Florida") with a gout flare. complaints of right foot pain that began three days prior. (R. 1031–35.) His blood pressure was 153/94 and 141/83. Other than a tender right foot, physical examination was within normal limits. X-rays revealed no abnormalities in his foot. Plaintiff was given toradol and colchine, and discharged.

Plaintiff returned to see Dr. Machek later that month, claiming to take his medications as prescribed and reporting no recent gout flares. (R. 1056–57.) His blood pressures were in the 130s/80s and his blood sugars

in the mornings measured in the 140s. He had no low sugars, fainting/dizziness, visual changes, headaches, chest pains, or irregular heart beats. Plaintiff's blood pressure was measured at 140/80 and physical examination was normal.

Plaintiff had another gout flare in his right foot on June 19, 2014, for which he was prescribed prednisone. (R. 1054–55.) A week later Plaintiff returned to UF Family Medicine and told Dr. Machek he had been doing well since his last gout attack, his morning sugars were in the 120s–140s without any low sugars, he was taking his medications as prescribed, and he had no chest pain, palpitations, abdominal pain, or blurry vision. (R. 1052–53.) Physical examination as within normal limits.

In July 2014, Plaintiff returned to see Dr. Machek with complaints of shoulder pain and lower back pain that radiated down his left leg. On examination Plaintiff had no pain or decreased range of motion with internal and external rotation of the hips, no pain with palpation of the lumbar spine or the sacroiliac joints, and no pain with lumbar flexion or extension. He demonstrated 5/5 strength in his lower extremities. Shoulder examination was positive for impingement sign, however, with decreased range of motion. Dr. Machek assessed Plaintiff with lumbago, prescribed

flexeril for lumbar muscle spasm, and prescribed a lumbar spine physical therapy program that included range of motion, back, and core strengthening.

Left shoulder x-rays taken that same month were largely normal without evidence of fracture, dislocation, or malalignment. (R. 1047–49.) There were, however, minimal degenerative changes seen in the AC joint and inferior glenoid. The joint spaces were well-preserved. Robert Michael Donlan, D.O., assessed Plaintiff with left shoulder pain and left shoulder impingement syndrome and performed a left subacromial bursa steroid injection. Plaintiff had relief within ten minutes post-injection. Dr. Donlan referred Plaintiff to physical therapy to improve his shoulder range of motion, overall function, and to decrease pain.

At the end of July 2014, Plaintiff presented to the emergency room at North Florida with complaints of right foot pain and right mid-abdominal pain. (R. 1012–18.) He denied blurry vision, chest pain, dyspnea on exertion, nausea, neck pain, back pain, arthritis, headache, and numbness. Plaintiff's blood pressure was 158/104 and 154/90. Other than tenderness on palpation over Plaintiff's right medial mid-foot, physical examination was within normal limits. He demonstrated full ranges of motion and no pain

elsewhere. Foot and ankle x-rays revealed no evidence of acute bony injury. Similarly, a CT-scan on his abdomen and pelvis revealed no finding to explain Plaintiff's symptoms. Plaintiff was assessed with left foot pain, abdominal pain, and discharged.

Plaintiff returned to UF Family Medicine on August 21, 2014, complaining of continued left shoulder pain despite the injection he received in July. Plaintiff stated that he could not participate in physical therapy and does not think physical therapy helps. On examination Plaintiff had tenderness in the left biceps tendon with limited range of motion and 4+/5 muscle strength. John David Blakeney Breck, D.O., assessed Plaintiff with left shoulder impingement, rotator cuff tear, and shoulder pain. Although Plaintiff said he was interested in surgery instead of physical therapy, Dr. Breck encouraged Plaintiff to continue with physical therapy until he could be seen by the surgical team (R. 1040–42.)

Plaintiff returned to UF Family Medicine a week later to see Dr. Machek. (R. 1037–39.) Plaintiff reported sugars in the 110s in the mornings and in the 120s two hours after meals. He told Dr. Machek that he had one low sugar in the 70s with slight dizziness, the dizziness resolved with food. Plaintiff also claimed he was taking his medications as

prescribed and reported improved control of his gout with uloric and allopurinol. Although his blood pressure was 160/90, physical examination was normal. Dr. Machek noted Plaintiff had improved his level of control over his diabetes, although the diabetes remained "uncontrolled." Dr. Machek therefore discussed with Plaintiff diet, exercise, and smoking cessation. He also assessed Plaintiff's hypertension to be uncontrolled and prescribed norvasc and aspirin.

By October 17, 2014, Plaintiff reported having less frequent gout flares since increasing the allopurinol and uloric medications and needing less insulin because he had improved his diet. (R. 1089–91.) Plaintiff told Dr. Machek, however, that he still had active symptoms related to diabetes complications, including painful peripheral neuropathy. On examination Plaintiff's blood pressure was 130/90 and his physical examination normal. Although Plaintiff had improved control, Dr. Machek continued to assess Plaintiff's diabetes as uncontrolled and referred Plaintiff for a pain management appointment for his diabetic neuropathy.

Plaintiff saw Dr. Odom later that month, reporting that his diabetes was under better control, despite issues with peripheral neuropathy, and denied chest pain, shortness of breath, dyspnea on exertion, palpitations,

syncope, leg swelling or new pain. Dr. Odom instructed Plaintiff to continue conservative measures, including a low carbohydrate diet, decreasing dietary sodium, increasing aerobic exercise, lose weight, and abstain from smoking. Dr. Odom also discussed with Plaintiff the importance of home blood glucose monitoring and blood pressure monitoring, as well as continuing physical therapy and continuing to use his prescribed knee braces (R. 1064–65.)

Following an evaluation with the surgical team for his left shoulder, Plaintiff underwent left shoulder arthroscopy with rotator cuff repair, biceps tenotomy, and distal clavicle resection on November 12, 2014. (R. 1069–77.)

By December 4, 2014, Plaintiff's shoulder was healing well. (R. 1080–82.) Plaintiff also told Dr. Machek that despite a gout flare several days prior, the pain had improved. Plaintiff admitted, however, that he was not checking his blood pressure but nevertheless denied fainting, dizziness, visual changes, headaches, chest pains, or irregular heart beats. On examination Plaintiff's blood pressure was 140/90 and his physical examination normal. Although Dr. Machek characterized Plaintiff's gout as improved and his hypertension to be "borderline controlled,"

Plaintiff's diabetes remained "uncontrolled." Dr. Machek therefore altered Plaintiff's medications and instructed Plaintiff to keep a radical diet and increase physical activity and exercise.

Plaintiff presented to the emergency department at Shands on December 24, 2014, with complaints of lower to mid-back pain that began two days earlier. (R. 1174–1180.) He denied urinary urgency, frequency, hematruia, saddle anesthesia, paresthesia, urine/stool incontinence or retention, numbness or tingling of extremities. Physical examination was normal except for tenderness, pain, and spasm in his thoracic back. An ultrasound of Plaintiff's abdomen revealed mildly echogenic kidneys, suggesting medical renal disease. (R. 1188.) There was, however, no acute abdominal abnormality or evidence of hydronephrosis. Plaintiff was assessed with back pain and muscle strain, prescribed oxycodone and flexeril, and discharged in stable condition (R. 1173, 1180.)

At his next follow-up with Dr. Odom on December 29, 2014, Plaintiff reported doing well and that his shoulder was healing slowly. (R. 1132–33.) Plaintiff still claimed to have issues with peripheral neuropathy, which Plaintiff felt to be related to his diabetes even though his diabetes was under better control.

The next day, Plaintiff presented to UF Family Medicine for a follow-up with Dr. Machek. (R. 1078–79.) Plaintiff claimed he was taking his medications as prescribed and regularly checking his blood pressure, which was usually in the 150s/90s. Plaintiff denied fainting, dizziness, visual changes, headaches, chest pains, or irregular heartbeats. On examination Plaintiff's blood pressure was 142/84 and physical examination was normal. Dr. Machek assessed Plaintiff's hypertension to be "borderline controlled."

Plaintiff returned to the OSMI on January 8, 2015, for a shoulder surgery follow-up. (R. 1131.) He reported continued improvement in his pain and that he was making good progress in physical therapy on increasing the range of motion in his shoulder.

He returned to OSMI the following month for another follow-up, however, reporting significant pain in his left shoulder that radiated into his neck and arm. (R. 1126–30.) Physical examination revealed tenderness and limited forward elevation. Neer/Hawkins, Jobe's Supraspinatus, and Cross-Shoulder Adduction tests were positive. Thomas Wright, M.D., noted that Plaintiff's pain was most consistent with nerve pain/irritation of the brachial plexus and therefore assessed Plaintiff with pain in the joint and

left rotator cuff impingement syndrome. Dr. Wright prescribed tramadol for pain and advised Plaintiff to increase gabapentin and continue physical therapy as tolerated

By March 4, 2015, Plaintiff's shoulder was healing slowly. (R. 1134–35.) Through March 2015 and April 2015, Plaintiff continued experiencing peripheral neuropathy despite obtaining better control over his diabetes. (R. 1134–37.) Plaintiff also began complaining of "widespread" musculoskeletal pain in his neck, back, and shoulders. Plaintiff's gout, however, was stable. Dr. Odom prescribed morphine and oxycodone for pain and instructed Plaintiff to continue a low carbohydrate diet, decrease dietary sodium, increase aerobic exercise, lose weight, abstain from smoking, monitor his blood glucose and blood pressure, continue with physical therapy, and continue using his knee braces.

## B.    Opinion Evidence

### 1.    Dr. Peele

Thomas Peele, M.D., a state agency physician, completed a physical residual functional capacity assessment for Plaintiff on July 5, 2013. (R. 152–55, 164–67.) Dr. Peele opined that Plaintiff can occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. He has no

other pushing or pulling limitations. Plaintiff can stand and/or walk for a total of six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. Although Plaintiff can only occasionally climb ramps/stairs and ladders/ropes/scaffolds, he has no other postural limitations. He has no manipulative, visual, or communicative limitations. He should avoid concentrated exposure to vibration and fumes, odors, dusts, gasses, and poor ventilation, and avoid even moderate exposure to hazards. Plaintiff, however, has no other environmental limitations.

### 2.    *Dr. Machek - January 14, 2014*

Dr. Machek completed a functional capacity evaluation for Plaintiff on January 14, 2014. (R. 962.) Based on Plaintiff's gout, diabetic neuropathy, rotator cuff impingement, knee pain, and chronic kidney disease, Dr. Machek opined Plaintiff can sit for two to three hours in an eight hour workday, but can only sit for five to ten minutes at a time before needing to move around. Plaintiff can stand/walk for one to two hours in an eight hour workday, but can only stand/walk for five to ten minutes at a time before needing to sit. Plaintiff must periodically alternate sitting and standing to relieve pain or discomfort every thirty minutes. Plaintiff requires an assistive device to ambulate even minimally in a normal workday, such as

a knee brace or wheel chair occasionally.

Dr. Machek further opined that Plaintiff can lift and/or carry 10 pounds occasionally and 5 pounds frequently. Plaintiff can frequently perform gross and fine manipulation. He can occasionally pull using arm and/or leg controls, reach, and operate motor vehicles. Plaintiff can rarely climb stairs or ladders and balance, bend and/or stoop, and work with or around hazardous machinery. Plaintiff does not need to avoid, however, dust, fumes, gases, extremes of temperatures, humidity, or other environmental pollutants.

Dr. Machek estimated that Plaintiff would be absent from work as a result of his impairments or treatment three days per month. He also opined that Plaintiff's pain or other symptoms would occasionally become severe enough to interfere with attention and concentration needed to perform even simple work tasks. Plaintiff would also require periods of time where he must lay down or elevate his legs to alleviate pain.

Dr. Machek opined that these restrictions began in January 2010.

### 3.    *Dr. Machek - March 9, 2015*

On March 9, 2015, Dr. Machek wrote a letter, at the request of Plaintiff, as an update on Plaintiff's overall medical conditions. (R.

1126–27.) Dr. Machek listed Plaintiff's active medical issues and then

stated:

> As his current disease progresses he ambulates with constant pain, secondary to degenerative joint disease in his knees and frequent gout flairs and well as neuropathy. He also recently underwent surgery for a torn rotator cuff and has not been progressing well with [physical therapy]. He is having radicular pain in his neck which is further impairing his activity of daily living. The [patient] has been on multiple medications to help modify and improve his overall disease state. He has undergone numerous conservative and invasive procedures in order to improve his overall functional status. I again further agree and support that Pierre Daniels has difficulty performing activities of daily living without assistance, and should be reconsidered for disability.

(*Id.* at 1127.)

## C.    The ALJ's Findings

The ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through June 30, 2012. (R. 37.)

She further determined that Plaintiff had not engaged in substantial gainful

activity since May 20, 2011. The ALJ found that Plaintiff has the following

severe impairments: (1) Diabetes mellitus; (2) Diabetes mellitus

neuropathy; (3) Chronic kidney disease; (4) Hypertension; (5) Gastro-

esophageal reflux disease; (6) Gouty arthropathy; (7) Polyarthralgia; (8)

History of right shoulder rotator cuff tear with surgical repair; (8) History of

left shoulder impingement with surgical intervention and consistent with

brachial plexus irritation; (9) Headaches; (10) Mild osteoarthritis of the right

knee; (11) Hearing loss in the left ear; (12) Vertigo; and (13) Obesity. At

step three, the ALJ did not find that any of the impairments or combination

of impairments met or medically equaled the severity of one of the listed

impairments. (R. 39.)

At step four the ALJ found that Plaintiff has the residual functional

capacity ("RFC") to perform light work as defined in 20 C.F.R. §§

404.1567(b) and 416.967(b), with additional limitations. (R. 39.) The ALJ

further determined that Plaintiff is unable to perform past relevant work. (R.

48.)

At step five, however, based on Plaintiff's age, education, work

experience, and RFC, the ALJ found there are jobs that exist in significant

numbers in the national economy Plaintiff can perform. (R. 48.)

Accordingly, the ALJ determined Plaintiff has not been under a disability

from May 20, 2011, through the date of the ALJ's decision. (R. 49.)

## IV.  DISCUSSION

Plaintiff's sole argument on appeal is that substantial evidence does

not support the ALJ's RFC determination, particularly with respect to the

weight given to Dr. Odom's opinion. (ECF No. 21.)

A claimant's RFC is the most a claimant can do, despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is based, not only on medical opinions, but also the ALJ's review of all relevant evidence in the record. *Id.*; 20 C.F.R. §§ 404.1546, 416.946.

The ALJ determined that Plaintiff has the RFC to perform light work, with the following additional limitations:

> [H]e can occasionally climb ramps and stairs, and never climb ladders, ropes or scaffolds. The claimant can occasionally kneel, crouch and crawl, and occasionally overhead reach, bilaterally. The claimant's exposure to noise is that of no more than moderate, as defined in the Selecte4d Characteristics of Occupations (SCO). "Moderate" is defined in the SCO as the noise intensity level in a business office where typewriters are used, department store, grocery store, light traffic, and fast food restaurant at off-hours. Further, the claimant must avoid concentrated exposure to vibration and avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. He must avoid even moderate exposure to hazards, such a[s] moving mechanical parts of equipment, tools, or machinery.

(ECF No. 11-2 at 40.)

Under SSR 83-10, "light work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting

most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Additionally, SSR 83-10 defines "frequent" as:

occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

Substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work with additional limitations.

Plaintiff's argues that the ALJ erred with regard to the weight the ALJ gave to Dr. Odom's opinion.  As support Plaintiff points to a discussion of Dr. Odom's opinion contained within the *prior* ALJ opinion, in which the prior ALJ gave Dr. Odom's opinion little weight. (ECF No. 21 at 22–23; R. 109.)  As the Commissioner correctly argues, the prior ALJ's "decision has no relevance to Plaintiff's claim before this Court, as the decision at issue

here found Plaintiff not disabled from May 20, 2011 through July 13, 2015 .

. . .” (ECF No. 22 at 10.)  Notably, the record does not contain any opinion

from Dr. Odom pertaining to the relevant time period.  It follows that ALJ

Colon did not—and could not—assign weight to any opinion from Dr.

Odom in the decision at issue in this appeal.

Although Plaintiff's memorandum mentions Dr. Machek's

opinion—which is included in the record before this Court—Plaintiff does

not advance or develop any argument in his brief that the ALJ erred with

respect to Dr. Machek's opinion.

> To preserve an issue for appeal, the party must raise the
> "specific issue to the district court" so that the district court has
> "an opportunity to consider the issue and rule on it." *Jones v.
> Apfel,* 190 F.3d 1224, 1228 (11th Cir. 1999). Generally, this
> means that the issue must be plainly and prominently raised,
> with supporting arguments and citations to the evidence and to
> relevant authority. *Sapuppo v. Allstate Floridian Ins. Co.*, 739
> F.3d 678, 681 (11th Cir. 2014).

*Morrison v. Comm'r of Soc. Sec.*, 660 F. App'x 829, 832 (11th Cir. 2016)

Thus, Plaintiff's argument that the (prior) ALJ's assignment of little weight

to Dr. Odom's opinion "is clearly not based on substantial evidence as Dr.

Michael Machek, a medical doctor, opined that . . . the plaintiff Daniels was

not capable of full-time work being limited to sitting 2 to 3 hours a day and

standing and walking for 1 or 2 hours per day," cannot constitute error as

the decision of the ALJ challenged in the case currently before the Court. In short, because Plaintiff makes no challenge to the weight given to Dr. Machek's opinion any argument that the ALJ erred in evaluating Dr. Machek's opinion is waived.

Even though Plaintiff does not raise any challenged to the weight ALJ Colon accorded to Dr. Machek's opinion the ALJ properly assigned it little weight. If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by

objective medical evidence." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1992). The Commissioner's reasons for refusing to credit a treating physician's opinion must be supported by substantial evidence. *MacGregor*, 786 F.2d at 1054.

In this case, after reviewing Dr. Machek's opinion, ALJ Colon assigned little weight to the opinion. (R. 47.)  As a reasons for doing so the ALJ relied upon the fact that Dr. Machek's opinion was inconsistent with and unsupported by Dr. Machek's own treatment notes.

For example, Dr. Machek opined that Plaintiff occasionally requires an assistive device to ambulate minimally, can sit for two to three hours and stand/walk for one to two hours in an eight hour workday, could sit five to ten minutes at a time before he would need to move around and stand/walk five to ten minutes at a time before he would need to sit, and

would need to alternate between sitting and standing every thirty minutes.
In stark contract to these conclusions Dr. Machek's own treatment notes
contain no evidence that Plaintiff had postural restrictions nor any mention
of a prescription for an assistive device. Instead, Dr. Machek's treatment
notes document that on multiple occasions, Plaintiff's pain was "largely
improved" (R. 546, 555, 754) and Plaintiff regularly had no chest pain or
dyspnea on exertion. (R. 725, 730, 736, 740, 745, 814, 916, 925, 928, 997,
1005, 1038, 1043.)  And notably, Dr. Machek's treatment notes evidence
during most examinations that Plaintiff's extremity examination was normal
and his strength intact (R. 546, 555, 751, 740, 743, 746, 751, 832, 835,
840, 917, 925–26, 928, 1006, 1038, 1044), findings which are inconsistent
with the limitations noted in Dr. Machek's opinion.

The ALJ further noted that despite Dr. Machek's opinion that Plaintiff
had manipulative restrictions, Dr. Machek's treatment notes contain no
mention of manipulative restrictions regarding pulling, gross or fine
manipulation, or operating motor vehicles. Instead, Dr. Machek's notes
reveal that in addition to intact strength and normal extremities, Plaintiff's
sensation was intact. (R. 751, 737, 740, 743, 746, 751, 817, 832, 835, 840,
917, 926, 928, 1006, 1038, 1044, 1057.)

The ALJ also found that with the exception of several specific restrictions, which the ALJ incorporated into her RFC,[3] the remainder of Dr. Machek's restrictions are not supported by Dr. Machek's own findings. For example, an independent review of the record reveals no mention in Dr. Machek's progress notes that Plaintiff has difficulty with attention or concentration. Nor do the progress notes suggest that Plaintiff must lay down or elevate his legs to alleviate pain.

Dr. Machek's opinions are not supported by detailed explanation and instead are contained in checked boxes or blanks filled in on a form. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). As the Commissioner points out, in forming his opinion Dr. Machek appears to have relied heavily on Plaintiff's report of subjective

---

[3] The ALJ found that Plaintiff's history of shoulder impairments supported Dr. Machek's restriction of occasional overhead reaching. Accordingly, the ALJ limited Plaintiff to occasional overhead reaching. (R. 39.) Similarly, due to Plaintiff's allegations of foot pain, the ALJ further limited Plaintiff to never climbing ladders, as opposed to Dr. Machek's opinion that Plaintiff could rarely climb ladders. (*Id.*)

symptoms, which the ALJ found not entirely credible. (R. 40.)[4]

The limitations in Dr. Machek's opinion are also generally inconsistent with other medical evidence in the record. *See* §§ 404.1527(c)(4), 416.927(c)(4). For example, no other treating providers noted functional limitations pertaining to walking, sitting, or manipulation. The vast majority of examination notes from other providers revealed relatively unremarkable physical examinations, a normal gait, and mild diagnostic imaging findings. (R. 360, 366–68, 377–79, 407–08, 414, 418, 424, 429, 439, 445, 448, 467, 490–91, 507–08, 538, 566–69, 579, 613, 633–34, 641, 676, 679–80, 967, 981–82, 1016, 1033, 1035, 1049, 1014–15, 1129, 1188.) And the record further supports the conclusion that Plaintiff's symptoms were largely controlled with adherence to medication regimens, physical therapy, and proper diet. (R. 423, 426–27, 438, 446, 546, 616, 676, 730–31, 920–21, 925–28, 983, 998, 1081–82, 1131.)

Finally, with respect to Dr. Machek's letter dated March 2015, the ALJ assigned little weight to Dr. Machek's assertion that Plaintiff ambulates with constant pain and that Plaintiff's pain impairs his activities of daily living. Dr. Machek, however, assigned no specific functional limitations. (R.

---

[4] Plaintiff does not challenge the ALJ's credibility finding. He has therefore waived any issues pertaining to the ALJ's credibility finding.

1126–27.) Instead, Dr. Machek's opinion was relatively vague and imprecise. The ALJ was not required to give controlling weight to Dr. Machek's opinion that Plaintiff should be reconsidered for disability because the issue of disability is a decision reserved to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *1–2 (July 2, 1996).

Contrary to Plaintiff's argument substantial evidence supports the ALJ's RFC determination that Plaintiff could perform light work with additional restrictions. Plaintiff regularly denied chest pain, vision changes, and headaches. Plaintiff's shoulder pain, strength, and range of motion improved following surgery and physical therapy. As discussed, Plaintiff consistently had normal physical examinations, including extremity and neurological examinations. Diagnostic tests and imaging were either normal or revealed relatively mild findings. Although Plaintiff occasionally reported peripheral neuropathy and was assessed with "uncontrolled" hypertension and diabetes, the record is replete with instances where Plaintiff either admitted to non-compliance with treatment and medication regimens or where providers questioned Plaintiff's compliance. Based upon this evidence the ALJ understandably found Plaintiff not entirely credible.

The ALJ also gave little weight to Dr. Machek's opinion for the reasons previously discussed, and instead gave great weight to Dr. Peele's physical residual functional capacity assessment, which was consistent with the objective medical evidence. Even though the ALJ gave great weight to Dr. Peele's opinion the ALJ, nonetheless, imposed several limitations more restrictive than recommended by Dr. Peele to account for Plaintiff's knee pain and shoulder pain.

In sum, because the prior ALJ accorded little weight to the opinion of Dr. Odom and not the ALJ who issued the decision which is the subject of this appeal, there can be no error. Moreover, good cause existed for the ALJ to discount Dr. Machek's opinions, and the ALJ's RFC finding is supported by substantial evidence. Accordingly, the Commissioner's decision should be affirmed.

## V.  RECOMMENDATION

In light of the foregoing it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** at Gainesville, Florida this 8th day of January 2018.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**